UNITED STATES of America,
Plaintiff–Appellee,

v.

James L. DIAMOND, Defendant–
Appellant.

No. 91–5143.

United States Court of Appeals,
Tenth Circuit.

July 20, 1992.

Kathleen Bliss Adams (Tony M. Graham, U.S. Atty., with her on the brief), Asst. U.S. Atty., Tulsa, Okl., for plaintiff-appellee.

Donald M. Bingham of Chapel, Riggs, Abney, Neal & Turpen, Tulsa, Okl., for defendant-appellant.

Before ANDERSON and BRORBY, Circuit Judges, and CAMPOS,* District Judge.

BRORBY, Circuit Judge.

Defendant James L. Diamond appeals from an order of the United States District Court for the Northern District of Oklahoma directing him to pay restitution and costs totalling $807,853. The court ordered the restitution after Mr. Diamond pleaded guilty to two counts of filing false reports with intent to defraud a federal agency in violation of 18 U.S.C. §§ 1006 and 2.

Mr. Diamond claims, *inter alia*, the district court exceeded its jurisdiction under 18 U.S.C. § 3663 by directing him to pay restitution for losses caused by conduct other than the specific offense for which he stood convicted. We reverse and remand for further proceedings.

## BACKGROUND

Since the late 1960's, Mr. Diamond owned and operated 100 percent of the Bartlesville Investment Corporation (BIC), a small business investment corporation licensed by the Small Business Association (SBA) to extend high risk loans to small-business entrepreneurs unable to obtain financing from other sources. As a "lender of last resort," the license permitted BIC to borrow up to three times its capital from the SBA.

Over the years, Mr. Diamond made personal capital investments in BIC totaling $645,000. As evidenced by two debentures issued in the 1970's, the SBA loaned BIC $1,710,000, exclusive of interest. BIC's obligation to repay Mr. Diamond's outstanding loans remained subordinate to BIC's obligation to repay the SBA debentures.

BIC's license to operate as an SBA investment corporation was subject to certain conditions. For instance, the SBA could call all monies advanced to BIC immediately, the SBA would review its outstanding debentures annually, and the government required Mr. Diamond to file annual reports with the SBA listing the amount and type of BIC's capital assets. Pursuant to 13 C.F.R. § 107.203, the SBA could dispose of the debentures or other securities held in connection with "the [l]everage" as it deemed reasonable.

In 1975, BIC purchased 500,000 shares of stock in Universal Energy Corporation (UEC) at twenty-five cents per share, for a total investment of $125,000.[1] Over the next five years, BIC sold some of these shares, reducing its ownership of UEC stock to 334,000 shares by 1980. During a period from June 1980 through June 1982, Mr. Diamond removed 295,800 shares of UEC stock from BIC's capital holdings and loaned 121,000 of those shares to Mr. Robert Alexander, president and a fellow director of UEC.[2] The reduction in stock represented 95 percent of BIC's total assets upon which the three-to-one ratio was calculated for the purpose of leverage. In its annual capitalization reports for 1981 through 1984, however, Mr. Diamond stated BIC held 334,000 shares of UEC stock. In reliance on the capitalization reports, SBA continued to extend the two debentures.

In July 1984, representatives of the Inspector General conducted an on-site audit of BIC's financial records at BIC's corpo-

---

* The Honorable Santiago E. Campos, United States District Judge for the District of New Mexico, sitting by designation.

1. Mr. Diamond served on UEC's Board of Directors, but he resigned that post in 1986. Universal Energy Corporation later changed its name to Oil Recovery Systems Corporation (ORS).

2. A Grand Jury indicted Mr. Alexander on numerous charges related to his receipt of the stock, including counts of mail fraud, attempting to defraud the SBA, conspiracy and embezzlement. Mr. Alexander is not a party to this appeal.

rate office in Bartlesville, Oklahoma. Inspectors asked Mr. Diamond to produce the stock certificates showing BIC's ownership of 334,000 shares of UEC stock reflected in BIC's corporate ledger. Despite some initial hedging, Mr. Diamond admitted BIC possessed certificates for only 38,200 shares of UEC stock. Mr. Diamond confessed he authorized sales of the missing 295,800 shares and loaned 121,000 shares to Mr. Alexander. The inspectors advised Mr. Diamond to restore the missing UEC shares.

Using his personal funds, Mr. Diamond replaced 295,800 shares of restricted, non-transferable UEC stock in July 1984, all of which was issued in BIC's name. However, the replacement stock was subject to three-year resale restrictions pursuant to Securities and Exchange Commission Rule 144.[3] Therefore, the stock was not fungible or equivalent to the stock Mr. Diamond previously removed. In August 1984, the SBA demanded payment of both debentures, still valued at slightly more than $1.7 million. With the debentures not secured to the extent reported in BIC's annual filing, BIC was "terribly undercapitalized" and unable to satisfy the debt.

A federal grand jury brought an eleven-count indictment against Mr. Diamond, alleging charges of fraud, mail fraud, conspiracy, embezzlement and filing false reports. In a plea agreement, the government later dismissed all but two counts which alleged Mr. Diamond filed false financial reports with the SBA in June 1983 and July 1984, grossly understating BIC's capital assets in violation of 18 U.S.C. §§ 1006 and 2.[4] After Mr. Diamond's guilty plea, the district court suspended imposition of sentence and placed him on probation for two concurrent four and one-half year terms. The district court also directed Mr. Diamond to make restitution, pursuant to the terms of a subsequent order issued June 5, 1987. In the order, drawn, agreed to and signed by both parties, the district court directed Mr. Diamond to pay the SBA restitution for any deficiency incurred by BIC in its repayment of leverage funds, plus accrued interest and expenses.

In response to a suit filed by the SBA on June 12, 1986, the district court appointed a receiver to liquidate BIC. The receiver disposed of BIC's viable assets and recouped $796,434 as of July 31, 1991. Several factors contributed to the remaining $1 million deficiency. For example, Mr. Diamond's replacement stock was not fully transferable until July 23, 1987.[5] Although the receiver exercised "utmost diligence" in attempting to sell the replacement stock from July 1986 to July 1987, all efforts proved unsuccessful because UEC failed to cooperate with the receiver by refusing to direct the transfer agent to reissue those shares without restriction. Meanwhile, the low bid price of the replacement shares fell from $4⅞ per share on July 23, 1986, to

---

**3.** Briefly summarized, the purpose behind Rule 144 is "[t]o provide full and fair disclosure of the character of the securities sold in interstate commerce ... and to prevent fraud in the sale thereof." 17 C.F.R. § 230.144, Preliminary Note (quoting Preamble) (emphasis omitted). The rule requires "a holding period prior to resale ... to assure that those persons who buy under [a claimed exemption to these rules] have assumed the economic risks of investment, and therefore are not acting as conduits for sale to the public of unregistered securities, directly or indirectly, on behalf of an issuer." 17 C.F.R. § 230.144 (1991), Preliminary Note. For general rule, *see* 17 C.F.R. § 230.144(d)(1); *see also* 17 C.F.R. § 230.144(a)(3) (defining restricted securities).

**4.** 18 U.S.C. § 1006 provides:

Whoever, being an officer, agent or employee of or connected in any capacity with ... any

small business investment company, with intent to defraud any [government lending institution] ... makes any false entry in any ... report or statement ... to any such institution ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. 18 U.S.C. § 1006 (1990 Supp.). Section 2 of the same Title states "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a) (1988).

**5.** On July 23, 1986, the 295,800 shares of UEC stock became eligible for sale by the SBA in an amount not to exceed one percent of UEC's 12,377,439 outstanding shares in any ninety day period. In other words, only one percent of the outstanding shares were available for sale each annual quarter.

$1⅝₁₆ per share when the stock became fully transferable. The 38,200 shares of UEC stock owned and properly maintained by BIC were fully marketable on June 12, 1986. However, UEC's continued lack of cooperation prevented sale of the stock until July 16, 1987, for $1.75 per share. Mr. Diamond also testified, and the district court found, much of the loss resulted from bad loans BIC made pursuant to SBA guidelines. In addition, the receivership incurred a minimum of $214,287 in liquidation expenses from June 12, 1986, to March 31, 1991.

On January 29, 1991, the district court filed its findings of fact and conclusions of law, ordering Mr. Diamond to pay "restitution for the amount of loss sustained 'as a result of the offense.'" The court also reduced to a "judgment" against Mr. Diamond the deficiency of $1.2 million, less any funds obtained from the sale of BIC assets. Mr. Diamond appealed the restitution order, and the government cross appealed.

The government filed a motion to revoke Mr. Diamond's probation on April 11, 1991, for an alleged probation violation. Mr. Diamond confessed the government's motion for revocation and the district court granted the motion in an Order filed May 21, 1991. The court vacated Mr. Diamond's probation and scheduled resentencing for August 14, 1991. The court also vacated its June 1987 restitution order, as well as all findings of fact and conclusions of law issued January 29, 1991.[6] According to an agreement incorporated by reference into the May 21 order, both parties agreed to dismiss their pending appeals, and the government agreed to recommend against

incarceration at resentencing provided Mr. Diamond had paid the receiver $320,000.

At the resentencing hearing, the parties submitted their stipulated facts and the government fixed the SBA's loss at $807,-853.[7] Without further hearings on Mr. Diamond's financial resources, the court entered its final restitution order on September 5, 1991. The court found "that in reliance upon [Mr. Diamond's] false reports, the SBA did not call the debentures when the capital value of BIC diminished. As a result of the false reports, [the] SBA sustained loss." After adopting by reference its previously vacated order of restitution dated June 5, 1987, and its findings of fact and conclusions of law filed January 29, 1991, the district court directed Mr. Diamond to pay the net remaining loss to the SBA, including costs, totalling $807,-853. This appeal followed.

## DISCUSSION

Under the Victim and Witness Protection Act of 1982 (VWPA), "[t]he court, when sentencing a defendant convicted of an offense under [title 18] ... may order, in addition to ... any other penalty authorized by law, that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1) (Supp.1990).[8] Restitution functions as part of the sentencing process. *United States v. Wainwright,* 938 F.2d 1096, 1098 (10th Cir.1991).

Before ordering restitution, the district court "shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors

---

6. The district court's order noted "[t]he parties reserve their rights to contest and present evidence upon any aspect of restitution and probation" subject to the court's consideration at resentencing. Furthermore, the court ordered Mr. Diamond to provide the government with all requested information concerning his financial condition.

7. The government calculated the deficiency at $1,127,853, less the $320,000 payment Mr. Diamond made as part of the sentencing agreement.

8. The restitution provisions in effect at the time the district court first ordered restitution on June 5, 1987 were recodified, effective November 1, 1987, pursuant to the Sentencing Reform Act of 1984, 98 Stat.1987. Accordingly, 18 U.S.C. § 3579 now appears as 18 U.S.C. § 3663, and 18 U.S.C. § 3580 appears as 18 U.S.C. § 3664. We address the statutes as they are currently codified.

as the court deems appropriate." 18 U.S.C. § 3664(a) (Supp.1990). The district court retains authority to resolve disputes over the proper amount of restitution by a preponderance of the evidence, with the government bearing the burden "of demonstrating the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(d) (1988). Conversely, the defendant carries the burden of demonstrating his financial resources and the financial needs of his dependents. *Id.*

■ Appellate review of whether a district court improperly imposed a restitution order is bifurcated. While we review the legality of the sentence de novo, we examine the amount of restitution only for abuse of discretion. *United States v. Teehee,* 893 F.2d 271, 273–74 (10th Cir.1990); *see also United States v. Rogat,* 924 F.2d 983, 985 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 1637, 113 L.Ed.2d 732 (1991); 18 U.S.C. § 3742(e) (1988). Moreover, we must accept the district court's findings of fact unless they are clearly erroneous. 18 U.S.C. § 3742(e); *Teehee,* 893 F.2d at 274. Restated, although we have no general authority to disturb a particular sentencing order, we must examine the "method or process" the district court used in calculating the sentence. *United States v. Watchman,* 749 F.2d 616, 619 (10th Cir.1984).

In its final 1991 order, the district court adopted its previously vacated 1987 restitution order, finding Mr. Diamond liable for "*any deficiency* which may be incurred by [BIC] in its repayment of leverage funds, plus accrued interest and expenses...." (Emphasis added.) The court also adopted by reference its previously vacated findings of fact and conclusions of law issued in January 1991—again finding Mr. Diamond liable for "any deficiency" on BIC's repayment of loans to the SBA. The district court then concluded:

> The evidence shows that in reliance upon the false reports, the SBA did not call the debentures when the capital value of BIC diminished. As a result of the false reports, then, SBA sustained loss. The Court therefore finds that restitution is

appropriate pursuant to 18 U.S.C. §§ 3663. The Court has reviewed the record with regard to the amount of restitution and finds by a preponderance of the evidence that, after all credits have been taken into account, the net loss to the SBA as a result of Defendant's false report[ ] is the sum of $807,853.00.

Mr. Diamond challenges the amount of ordered restitution, claiming much of the restitution order covers losses attributable to his unauthorized transfer of UEC stock and BIC's general financial deterioration rather than his false reports. He asserts: (1) the government failed to prove by a preponderance of the evidence the amount of SBA's loss attributable to his false statements on BIC's annual capitalization reports; (2) the district court exceeded its jurisdiction under § 3663 by directing him to pay restitution for losses caused by conduct other than the specific offense for which he stood convicted; (3) the district court did not make specific findings sufficient for meaningful review of the restitution issue; and (4) the district court erred by incorporating into its restitution order previously vacated orders and findings. While we realize "[t]he determination of an appropriate restitution amount is by nature an inexact science," *Teehee,* 893 F.2d at 274, we agree with each of Mr. Diamond's contentions. Accordingly, we vacate the district court's order pursuant to 18 U.S.C. § 3742(f)(1) (1988).

In *Hughey v. United States,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), the Supreme Court held "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Id.* at 413, 110 S.Ct. at 1981; *United States v. Novey,* 922 F.2d 624, 629 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991). Thus, a "restitution order that encompasses losses stemming from charges not resulting in convictions is unauthorized by the restitution statute." *Wainwright,* 938 F.2d at 1098 (citing *Hughey,* 495 U.S. at 421–22, 110 S.Ct. at 1985). In light of

this precedent, the district court's final 1991 order is invalid as the court exceeded its jurisdiction with respect to the amount of allowable restitution under the VWPA.

■ The government argues Mr. Diamond's false reports induced the SBA to continue financing BIC's outstanding $1.7 million debt rather than call the debentures. Emphasizing the district court found "the net loss to the SBA as a result of [Mr. Diamond's] false report[ ] is the sum of $807,853.00," the government maintains it met its burden of proof because no speculation exists "as to the amount of the debentures, which comprise the gross loss caused by [Mr.] Diamond's false statements." Aple. br. at 14. In essence, the government appears to assert the district court's findings are not clearly erroneous and the court did not abuse its discretion in fixing the amount of the restitution, particularly where Mr. Diamond acknowledged he was "legally bound" and "personally liable" to pay the deficiency.[9] We disagree.

Foremost, no evidence exists the ordered $807,853 in restitution represents losses attributable to Mr. Diamond's false reports in 1983 and 1984. The government calculated the SBA's loss at $807,853 based on BIC's original $1,710,000 debt, less $796,434 recouped from the liquidation of BIC's assets, less $320,000 received from Mr. Diamond in exchange for the government's promise not to recommend incarceration, plus expenses in liquidating BIC totalling $214,287. Although these figures arguably show the overall financial loss the

SBA suffered as a result of BIC's insolvency, they do not necessarily reflect the SBA's loss resulting from Mr. Diamond's false reports.

No dispute exists that Mr. Diamond's false reports induced the SBA to *extend* its outstanding loan. However, the fact remains the SBA loaned BIC the $1.7 million *before* Mr. Diamond submitted the false reports in 1983 and 1984. Nevertheless, the government contends it called the loan *"because of* [Mr.] Diamond's false statements." (Emphasis in original.) The government clearly misses the point.

Indeed, the SBA may have called the debentures *because of* Mr. Diamond's false reports, but that does not mean the false reports *caused* the SBA's total loss. BIC's original debt did not arise out of the conduct for which Mr. Diamond was convicted. Furthermore, we fail to see how the SBA's extension of the outstanding loan equates to a new loan based on the false reports. No evidence exists the SBA lost *any* money or suffered *any* detriment as a result of Mr. Diamond's false reports.

The government clearly sought to recover the SBA's total loss by bootstrapping BIC's outstanding debt to Mr. Diamond's restitution order. When attempting to calculate the SBA's loss for restitution purposes during the 1987 sentencing hearing, the prosecutor told the court the *starting point* for determining SBA's total loss would begin with BIC's $1.7 million debt, and would have to include numerous fees and interest charges, less the money recovered from the sale of UEC stock held by

---

**9.** The government emphasizes Mr. Diamond admitted personal liability for the entire deficit during presentencing hearings in 1987, and later acknowledged the court's first restitution order. In effect, the government appears to argue Mr. Diamond's acknowledged responsibility for the SBA's loss somehow justifies the ordered restitution. Granted, Congress amended the VWPA only months after the Supreme Court decided *Hughey*, specifically to permit courts to "order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." *Crime Control Act of 1990*, Pub.L. No. 101–647, § 2509, 104 Stat. 4789, 4863 (1990), *codified at* 18 U.S.C. § 3663(a)(3) (Supp.1992). However, we see no evidence Mr. Diamond agreed as part of a plea bargain to pay restitution for any

deficiency in BIC's repayment of loans to the SBA. Mr. Diamond acknowledged the district court's original restitution order, not as part of plea negotiations, but rather, because he was under a court order to construct a restitution order in cooperation with the government.

Additionally, the fact that in the wake of *Hughey* Congress amended the VWPA to permit restitution to the extent plea-bargained by the parties dispels any suggestion the VWPA, at the time of Mr. Diamond's plea, authorized such sweeping restitution. We note also that during post-*Hughey* resentencing negotiations in 1991, Mr. Diamond specifically limited his liability to a $320,000 payment in return for the government's promise not to seek incarceration.

BIC. Furthermore, the prosecutor insomuch as acknowledged the SBA's loss arose, not from Mr. Diamond's false reports, but from his unauthorized transfer of stock. He conceded the SBA would not be in the position it is now, "speculative or otherwise, had [Mr. Diamond] not divested [BIC] of that stock and sold it and given the money to [Mr.] Alexander." The government dismissed all charges related to Mr. Diamond's unauthorized transfer of stock, and cannot now seek recovery under criminal law for losses arising out of that specific conduct.

The government's reliance on BIC's original debt as the focal point for determining the SBA's losses resulting from Mr. Diamond's false reports ignores the import of *Hughey*. The burden rests with the government to demonstrate Mr. Diamond's false reports, rather than other conduct leading to BIC's insolvency, resulted in a loss recoverable through restitution. The government cannot recover losses which would have occurred despite the SBA's reliance on the false reports.

■ As Mr. Diamond points out, the district court failed to indicate sufficiently for appellate review the "method or process" it used to arrive at the $807,583 figure. *See Watchman*, 749 F.2d at 619. Instead, the court focused on BIC's outstanding deficiency, BIC's recoverable assets and Mr. Diamond's lack of cooperation in liquidating BIC, and announced "the net loss to the SBA as a result of Defendant's false report[ ] is the sum of $807,853." From our review of the record, the ordered restitution merely reflects the amount of restitution recommended by the government.[10] However, in terms of restitution, the government failed to distinguish between losses attributable to Mr. Diamond's false reports, and unrecoverable losses arising out of Mr. Diamond's unauthorized transfer of stock and BIC's bad loans. The district court's finding that the SBA sustained a loss of $807,853 *as a result of* Mr. Diamond's offense of conviction is clearly erroneous as the government put forth no proof the SBA lost any money as a result of the false reports.

■ The district court also improperly considered Mr. Diamond's lack of cooperation with BIC's receiver in fixing the amount of restitution due. In its January 1991 findings, the district court detailed numerous examples of Mr. Diamond's lack of cooperation during the sale of BIC's assets, and noted "judgment should be entered against Mr. Diamond for the result of his offense which *has been compounded by his lack of cooperation.*" (Emphasis added.) Although in calculating the amount of restitution, 18 U.S.C. § 3664(a) allows courts to consider "such other factors as the court deems appropriate," the Supreme Court made clear in *Hughey* "the catchall phrase should not be read to introduce into the restitution calculus losses that would expand a defendant's liability beyond the offense of conviction." *Hughey*, 495 U.S. at 419, 110 S.Ct. at 1984. In other words, the catchall phrase, like the other factors enumerated in § 3664(a), is "designed to limit, rather than to expand, the scope of any order of restitution." *Id.* at 418–19, 110 S.Ct. at 1984. Because the

---

10. The amount of ordered restitution is fundamentally suspect because in calculating the SBA's loss the district court based its order on *United States v. Hill*, 798 F.2d 402, 406 (10th Cir.1986). In *Hill*, we held in calculating the proper amount of restitution under the VWPA, courts are not limited to the loss specified in the indictment, the particular counts of an offense or the specific transactions alleged in the indictment. *Id.* at 406. The Supreme Court's decision in *Hughey*, as recognized by *Novey*, 922 F.2d at 629, clearly abrogated our liberal reading of the VWPA in *Hill*.

Although Mr. Diamond entered his guilty plea before the Supreme Court decided *Hughey*, the law in effect at the date of sentencing, rather than the date of the crime, determines the applicable law. *United States v. Arnold*, 947 F.2d 1236, 1237 & n. 1 (5th Cir.1991); *see Hughey*, 495 U.S. at 413 n. 1, 110 S.Ct. at 1981 n. 1 (implicitly agreeing); *see also Novey*, 922 F.2d at 629 (citing *Brown v. M & M/Mars*, 883 F.2d 505, 512–13 (7th Cir.1989)) (appellate court should apply the law in existence at the time of appeal). As in *Arnold*, we note that any change of law *increasing* the penalty attributable to a particular crime would compel us to apply the version of the law in force on the date of the crime, pursuant to the prohibition against ex post facto laws. *See Arnold*, 947 F.2d at 1237 n. 1 (citing U.S.C.A.Const. Art. 1, § 10, cl.1).

district court included as restitution losses not attributable to Mr. Diamond's offense of conviction, the court exceeded its statutory authority under the VWPA. Accordingly, the district court abused its discretion by ordering restitution in the amount of $807,853. *See United States v. Cook,* 952 F.2d 1262, 1265–66 (10th Cir.1991).

Mr. Diamond argues the district court is also without authority to include as restitution SBA's attorney's fees and expenses in liquidating BIC's assets. Claiming the expenses are an "integral part" of the SBA's loss, the government asserts "[t]he concept of actual loss [under the VWPA] contemplates the risk of loss to a victim, including assessment of net recovery of collateral." Aple. br. at 18. Not only is the VWPA silent on this issue, but this question apparently is one of first impression in this circuit.

Numerous courts have held the VWPA does not authorize consequential damages such as attorney's fees and expenses as part of restitution. *See United States v. Arvanitis,* 902 F.2d 489, 497 (7th Cir.1990) (legal fees generated in prosecuting a claim are not recoverable under VWPA); *United States v. Barany,* 884 F.2d 1255, 1261 (9th Cir.1989), *cert. denied,* 493 U.S. 1034, 110 S.Ct. 755, 107 L.Ed.2d 771 (1990) (attorney's fees in defending civil suit too remote from losses resulting from defendant's criminal conduct to serve as basis for restitution under VWPA); *United States v. Mitchell,* 876 F.2d 1178, 1183–84 (5th Cir. 1989) (no authority under VWPA to authorize restitution for lost income or cost of employing counsel to recover losses from an insurance company); *United States v. Kenney,* 789 F.2d 783, 784 (9th Cir.) (restitution for witnesses' salaries during court proceedings too remote to form the basis for restitution and outside the statutory framework of VWPA), *cert. denied* 479 U.S. 990, 107 S.Ct. 586, 93 L.Ed.2d 588 (1986); *see also United States v. Pollak,* 844 F.2d 145, 154 (3d Cir.1988) (although arguably part of victim's losses, recovery expenses such as legal fees, transportation and storage costs resulting from scheme to defraud are not directly caused by offense of conviction and therefore not authorized

under analogous Federal Probation Act); *United States v. Trettenaro,* 601 F.Supp. 183, 185 (D.Colo.1985) (expenses connected with recovery of stolen property not compensable in restitution under VWPA). *But cf. United States v. Kress,* 944 F.2d 155, 159–60 (3d Cir.1991) (permitting post-judgment interest on restitution owed to the federal government because interest flows out of the principal amount due and furthers the compensatory goal of the VWPA), *cert. denied,* —— U.S. ——, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992).

In the absence of specific statutory authority for an award of attorney's fees and expenses, we believe *Hughey* is decisive as it limits the substantive boundaries of restitution under the VWPA to the specific conduct underlying the offense of conviction. 495 U.S. at 413, 110 S.Ct. at 1981. Expenses generated in recovering a victim's losses, therefore, generally are too far removed from the underlying criminal conduct to form the basis of a restitution order. Accordingly, we hold the fees and expenses accrued in liquidating BIC are not recoverable in restitution, particularly where the government concedes the expenses were not directly related to the criminal conduct for which Mr. Diamond was convicted.

Granted, the congressional declaration of purpose behind the VWPA, see, *e.g.,* § 2(b)(2), note following 18 U.S.C. § 1512, and legislative history behind the Act, favor the "fullest possible restitution from criminal wrongdoers." *Id.,* 495 U.S. at 420, 110 S.Ct. at 1984 (quoting 128 Cong.Rec. 27391 (1982) (remarks of Rep. Rodino)). However, as noted in *Hughey,* "[e]ven were the statutory language regarding the scope of a court's authority to order restitution ambiguous, long-standing principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of the defendant," preclude resolution of the ambiguity against the defendant. *Id.,* 495 U.S. at 422, 110 S.Ct. at 1985 (citations omitted).

Next, Mr. Diamond maintains the district court erred by incorporating into its final

1991 restitution order previously vacated findings of fact and conclusions of law. More specifically, Mr. Diamond protests a $1.2 million "judgment" assessed against him in the district court's January 1991 findings and conclusions. He maintains a judgment would arguably survive the expiration of his probation term. We are uncertain what the district court intended by reducing the restitution order to a "judgment." To the extent it represents a consent judgment, the order is invalid.

Although a restitution order is characteristically similar to a civil judgment in that it compensates a victim for losses and remains enforceable at civil law, the court cannot convert a criminal sentence into a civil judgment. *United States v. Snider*, 957 F.2d 703, 707 (9th Cir.1992) (quoting *United States v. Ciambrone*, 602 F.Supp. 563, 568 (S.D.N.Y.1984)). Where a court orders restitution under the VWPA, it "may not require the defendant to execute a consent judgment or otherwise require him to secure payment 'during and after the period of probation.'" *United States v. Joseph*, 914 F.2d 780, 786 (6th Cir.1990). Although a court may require a defendant to make restitution under the VWPA "within a specified period or in specified installments," 18 U.S.C. § 3663(f)(1) (1988), the duration of such period or the last such installment "shall not be later than—(A) the end of the period of probation, if probation is ordered." *Id.* at § 3663(f)(2)(A).

The government argues the district court did not require Mr. Diamond to enter a consent judgment and merely reduced the deficiency to a judgment of restitution. Citing *Kress*, 944 F.2d at 160, the government maintains a judgment of restitution "'does not differ in essence from a judgment arising out of civil proceedings ...'" [and is viewed as] a debt to a victim." *Id.* (quoting *United States v. Sleight*, 808 F.2d 1012, 1020 (3d Cir.1987)). We agree 18 U.S.C. § 3663(h)(1)(B) (1988) allows enforcement of a restitution order "in the *same manner* as a judgment in a civil action." (Emphasis added.) Nevertheless, we believe the final order, as written, creates unnecessary ambiguity as the $1.2 million "judgment" appears separate and distinct from the court's final $807,853 restitution order. The two orders contradict each other in terms of restitution amount. The ambiguity underlying the final order probably arose, in part, out of Mr. Diamond's assurances to the court that he would pay any deficiency BIC might owe the SBA. On remand, the district court should resolve the ambiguity, consistent with the other considerations noted in this opinion.

Mr. Diamond also argues (1) he should receive the July 1986 value rather than the substantially diminished July 1987 value of his 295,800 replacement shares of UEC stock; and (2) the court should not hold him liable for the deterioration of BIC's assets between 1984, when the SBA first discovered the missing stock, and 1986, when the SBA finally sought a receiver for BIC.

Because the record is incomplete with respect to the full nature of the SBA's reliance on Mr. Diamond's false reports and the specific losses resulting from the conduct underlying his offense of conviction, we decline review of these questions. The district court sits in a far better position to resolve these issues on remand.

Finally, Mr. Diamond argues he was denied a meaningful opportunity to present evidence on his inability to pay restitution and the effect a restitution order would have on his dependent wife—factors the court must consider under 18 U.S.C. § 3664(a) before ordering restitution. We remand with specific instructions on this point.

## CONCLUSION

We therefore set aside the district court's order, dated September 5, 1991, and remand for further findings of fact and conclusions of law consistent with 18 U.S.C. §§ 3663 and 3664, the Supreme Court's decision in *Hughey* and this opinion. In so doing, the district court should consider the factors enumerated in § 3664 "are designed to limit, rather than to expand, the scope of any order of restitu-

tion." *Hughey*, 495 U.S. at 418, 110 S.Ct. at 1983.

Because "[t]he burden of demonstrating the financial resources of the defendant and the financial needs of the defendant and such defendant's dependents" rests with the defendant, 18 U.S.C. § 3664(d), Mr. Diamond must receive a meaningful opportunity to present evidence in this regard.

Any order of restitution must include a finding that the government proved by a preponderance of the evidence the amount of the SBA's loss resulting from "the specific conduct that is the basis of the offense of conviction." *Hughey*, 495 U.S. at 413, 110 S.Ct. at 1981. Furthermore, the findings must be sufficiently detailed to allow this court to review the "method or process" by which the district court calculated any ordered restitution.

REVERSED AND REMANDED.