# United States Court of Appeals
## For the First Circuit

No. 01-1807

UNITED STATES,

Appellee,

v.

LIONEL CUTTER,

Plaintiff, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell and Magill,[*] Senior Circuit Judges.

Jonathan R. Saxe, Assistant Federal Public Defender, Federal Defender Office, for appellant.
Mark E. Howard, Assistant United States Attorney, with whom Thomas P. Colantuono, United States Attorney, and Donald Feith, Assistant United States Attorney, were on brief, for appellee.

December 10, 2002

[*]Of the Eighth Circuit, sitting by designation.

**CAMPBELL, <u>Senior Circuit Judge</u>**. Lionel Cutter ("Cutter") appeals from his conviction and his 20-month sentence in the district court for concealing assets and making a false oath in bankruptcy. 18 U.S.C. § 152(1)-(2) (2000). Cutter also appeals from a $21,000 restitution award to his niece, Adele Bailey ("Bailey"), ordered by the district court. While we affirm his conviction and sentence, we reverse the district court's restitution order.

I.        **Background**

Cutter's conviction for making a false oath in bankruptcy and concealing assets stemmed from statements he made in his bankruptcy petition, and during subsequent bankruptcy proceedings, to the effect that he had sold his home to his niece, Bailey, for $40,000.

In the summer of 1996, to satisfy several outstanding debts, including approximately $36,000 in taxes and interest owed the Internal Revenue Service ("IRS"), Cutter placed his home on the market. At the same time, his twenty year old niece, Bailey, was preparing to receive $72,500 in settlement of injuries received in a car accident. Cutter agreed to sell his home to Bailey. To prepare the necessary paperwork, Cutter hired Attorney Craig Evans ("Evans" or "Attorney Evans"). Cutter informed Evans that the house, which had earlier been listed for $95,000 (and was

ultimately appraised for the bankruptcy court at $102,000), was sold to Bailey for $40,000.

On November 1, 1996, the closing date for the sale of the house, Cutter instructed Bailey to prepare and deliver a check for $40,000 to Franklin Savings Bank which held a $26,000 mortgage on the home. She complied. Bailey, who understood the sale price to be $72,000, also provided Cutter personally with a check for an additional $30,000. Cutter, who had since negotiated a settlement with the IRS, returned the $30,000 check to Bailey, telling her to instead prepare a check for $18,000 made payable to the IRS. According to Bailey, Cutter also instructed her to pay him $12,000 in cash in two lump-sum payments of $6,000 over a period of several weeks. Bailey's bank records show that on two separate occasions in November 1996 she withdrew $6,000 in cash, and Bailey testified that she made these cash payments to Cutter. Cutter steadfastly denied that he received an additional $12,000 from Bailey. In consideration for the home, Bailey also paid $2,250 in outstanding property taxes.

On March 20, 1997, Cutter filed for bankruptcy. The bankruptcy petition was prepared by Attorney Evans, the same attorney who prepared the real estate documents for the sale of Cutter's home. In the Statement of Financial Affairs, Evans reported that Cutter had transferred his home on November 1, 1996, for $40,000 to his niece Bailey. On the same page listing the sale

-3-

price of his home, Cutter signed his name under the statement: "I declare under the penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct."

At the section 341 meeting,[1] Attorney Timothy Smith ("Attorney Smith"), the appointed trustee for the bankruptcy estate, questioned Cutter about the transfer of his home to his niece. Under oath, Cutter reported to Attorney Smith that the house was sold for $40,000 and that "[$]26,000 went to pay the mortgage, and we put the money with the remainder of the money to pay the IRS."

Because it appeared that the house had been sold for less than its full value, Attorney Smith instituted a fraudulent conveyance action against Bailey to recover the property for the benefit of the creditors.[2] To prepare for the action, the estate, through Attorney Michael Askenaizer ("Attorney Askenaizer"), conducted a Rule 2004 examination in which Cutter testified. Attorney Askenaizer asked Cutter if the house was sold for $40,000, to which Cutter replied "yes and no." Cutter explained that the

---

[1]11 U.S.C. § 341 (1993 & Supp. VIII) requires "within a reasonable time after the order for relief . . . the United States trustee shall convene and preside at a meeting of creditors."

[2]11 U.S.C. § 548(a)(1)(B) (1993 & Supp. VIII) allows a trustee to avoid any transfer in interest of the debtor that was made within one year of the filing of the petition if the debtor "received less that reasonably equivalent value in exchange for such transfer."

price included $40,000 plus Cutter's outstanding IRS taxes and property tax. The disclosure of these additional amounts raised the disclosed sale price to approximately $60,000. To support the revised sale price, Bailey, through Attorney Evans, submitted an affidavit to the court averring that she had bought the house for $58,000.

The estate and Bailey settled the fraudulent conveyance action. Bailey agreed to pay the estate $20,000. To do so, she was forced to sell the house. The house, appraised for the bankruptcy court at approximately $102,000, sold for $87,500.

On September 28, 2000, Cutter was indicted on one count of concealing assets in a bankruptcy proceeding in violation of 18 U.S.C. § 152(1) and one count of making a false oath in bankruptcy in violation of 18 U.S.C. § 152(2).[3] After a two-day jury trial, the jury convicted Cutter under both counts. The district court thereafter sentenced him to a 20-month imprisonment; and ordered him to pay Bailey $21,000 in restitution - $20,000 representing the

---

[3] 18 U.S.C. § 152 provides:
A person who -
(1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with control or custody of property, or, in connection with a case under Title 11 . . . any property belonging to the estate of a debtor;
(2) knowingly and fraudulently makes a false oath or account in or in relation to any case under Title 11 . . . shall be fined under this title, imprisoned not more than five years, or both.

amount she paid to the bankruptcy estate and $1,000 to compensate her for attorney fees.  This appeal followed.

## II.        Discussion

## A.        Sufficiency of the Evidence

Cutter contends that there was insufficient evidence that he "knowingly" made a false oath in bankruptcy.[4]  While Cutter concedes that he had sold his home for more than the $40,000 he listed on his bankruptcy petition, he contends he was unaware the bankruptcy petition was inaccurate.  He argues that Attorney Evans' testimony shows his lack of awareness and undercuts the government's other evidence.

It is the jury's role, however, not that of appellate courts, to weigh the evidence. Evans conceded that during the period he represented Cutter he was suffering from severe depression that adversely affected his memory of events. Even at face value, moreover, Evans' testimony was less helpful to Cutter then Cutter now contends.  His testimony did not unequivocally contradict the proposition that Cutter had knowingly provided a false oath in the bankruptcy proceeding.  When asked on direct

_____

[4]To support a conviction for making a false oath in bankruptcy under 18 U.S.C. § 152(2) the prosecution is required to establish (1) the existence of bankruptcy proceedings; (2) that a false statement was made in the proceedings under penalty of perjury; (3) as to a material fact; and (4) that the statement was knowingly and fraudulently made.  Cutter concedes that the $40,000 figure listed on his petition was false; he contends, however, that he was unaware of the error when he signed the petition.

examination whether Cutter reviewed the petition prior to signing it, Evans merely responded: "I don't have any recollection that he took the form and went over it in any detail." Evans testified that when he prepared the paperwork for the real estate transaction Cutter informed him the house had sold for $40,000, a misrepresentation upon which Evans said he relied when completing the bankruptcy petition. Evans' testimony did not explain the false statements that Cutter provided at the section 341 meeting and during the Rule 2004 examination.

Viewed in the light most favorable to the prosecution, the evidence permitted a rational jury to find that Cutter knowingly made a false oath in bankruptcy. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Woodard, 149 F.3d 46, 56 (1st Cir. 1998), cert. denied, 525 U.S. 1138 (1999). When Cutter signed the bankruptcy petition he represented, under the penalty of perjury, that all the information was correct. His signature appears on the same page as, and just below, the incorrect sales price. The transcript of the section 341 meeting reveals that Cutter stated, under oath, that he had sold the house for $40,000, and intimated that he used the proceeds remaining after payment of the mortgage to pay his tax obligation to the IRS. It was not until the 2004 examination that Cutter admitted that Bailey had paid at least $60,000 for the home - $40,000 payment to Franklin Savings Bank, $18,000 to the IRS, and property taxes in excess of

$2,000. Even this statement by Cutter was incorrect. The jury heard Bailey testify that she had paid $72,000 for the property including two cash payments of $6,000 each made directly to Cutter. Bailey's testimony was corroborated by her bank statements.[5]

As there was ample evidence from which the jury could conclude that Cutter knowingly made a false oath in a bankruptcy proceeding in violation of 18 U.S.C. § 152(2), we need not address Cutter's secondary argument that his conviction for concealing assets must fall as well.

B.        **Base Level Offense Enhancement**

Cutter is likewise unpersuasive that the district court erred when it enhanced his sentence by four levels based on an intended loss calculation. See U.S.S.G. § 2F1.1(b)(1)(E) (2001). A district court's findings of intended loss are reviewed only for clear error. See United States v. Robbio, 186 F.3d 37, 43 (1st Cir.), cert. denied, 528 U.S. 1056 (1999). We have said that "a party dissatisfied with [a] sentencing court's quantification of

---

[5]The facts of this case can easily be distinguished from those in United States v. McCormick, 72 F.3d 1404 (9th Cir. 1995), on which Cutter relies. In reversing the defendant's conviction for bankruptcy fraud, the Ninth Circuit noted that Tracey, the wife of the primary debtor, was not involved in the preparation of the petition. Here, Cutter provided the incorrect sales figure used on the petition. In addition, Tracey's signature did not appear on the bankruptcy schedule where the omitted bank account should have been listed. In contrast, Cutter's signature is on the same page as the false information. Finally, there was uncontradicted testimony that Tracey did not read the petition prior to signing it. There is no such evidence here.

the amount of loss . . . must go a long way to demonstrate clear error."  United States v. Rowe, 202 F.3d 37, 42 (1st Cir. 2000) (internal quotations omitted).

In determining that the intended loss fell within the $20,000 to $40,000 range, the district court offered three different rationales:  (1) that the intended loss was $32,000 - the $72,000 that Bailey actually paid for the house minus the $40,000 reported by Cutter on the bankruptcy petition; (2) that the intended loss was the $20,000 Bailey paid into the bankruptcy estate plus her $1,000 in attorneys fees; or (3) that the intended loss was the $12,000 paid in cash to Cutter by Bailey, plus the approximately $14,000 in cash that Cutter and his wife received after their mortgage was satisfied, plus the $943 that was held in escrow and paid to the Cutters by the bank.  In opposing the calculation, Cutter insists that the intended loss was limited to $12,000 - reflecting the cash payment made from Bailey to Cutter.

We believe the district court's calculation of an intended loss between $20,000 and $40,000 was amply supported.  The commentary to section 2F1.1 states that the loss "need not be determined with precision[,] the court need only make a reasonable estimate of the loss, given the available information."  U.S.S.G. § 2F1.1, cmt. n.9; see also United States v. Blastos, 258 F.3d 25, 30 (1st Cir. 2001).

Loss is defined as the "value of the money, property, or services unlawfully taken."  U.S.S.G. § 2F1.1, cmt. n.8.  Cutter concealed from the bankruptcy court the receipt of approximately $32,000 when he stated in his petition, and at the section 341 meeting, that he sold his home for only $40,000.  See United States v. Dolan, 120 F.3d 856, 870 (8th Cir. 1997) (using value of assets concealed to determine intended loss in bankruptcy fraud).  This figure is not a great deal higher than the approximately $28,000 that Cutter realized on the sale of his house after deducting the sums used for the retirement of his mortgage, payment of taxes, settlement with the IRS of back due taxes, and payment of the Registry of Deeds fees.  See United States v. Stein, 233 F.3d 6, 17 (1st Cir. 2000), cert. denied, 532 U.S. 943 (2001) (upholding an intended loss calculation based on the defendants' net gain over the mortgage and expenses).  Either way, the four-level enhancement stands.

Cutter contends that any loss calculation should not include the $18,000 paid to the IRS or the over $2,000 that went to pay property taxes because that money was used to pay creditors of the estate.  Because the funds went to creditors of the estate, he says he could not have intended a loss to the estate.  Cutter maintains that this court's decision in Rowe supports this proposition.  202 F.3d at 42.

Cutter's argument is without merit. As already noted, the record supports an intended loss greater than $20,000, even if one excludes the mortgage and taxes. Even then, Cutter personally stood to net in excess of $20,000 by concealing the buyer's total payment of $72,000 for the property. Rowe is not to the contrary. In Rowe a district court's loss calculation was deemed erroneous because the court's loss estimation "was inconsistent with the record and had no discernible connection to the amounts that both the government . . . and Rowe . . . had proposed." Id.

## C. Restitution

Lastly, Cutter contends that the district court erred when it found that Adele Bailey was a victim of Cutter's crime and ordered restitution to her in the amount of $21,000 - representing the $20,000 Bailey was required to pay to the estate in settlement of its fraudulent conveyance action against her and the $1,000 she paid to an attorney to represent her in that action. Restitution orders are customarily reviewed for abuse of discretion, and the subsidiary findings of fact for clear error. United States v. Paradis, 219 F.3d 22, 24 (1st Cir. 2000); United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996). To the extent that a challenge to a restitution order hinges on a legal question, however, the sentencing court's answer to that question is reviewed de novo. United States v. Vaknin, 112 F.3d 579, 585 (1st Cir. 1997).

-11-

For fraud offenses, such as the ones for which Cutter was convicted, the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A (2000), governs restitution. See United States v. Richard, 234 F.3d 763, 770-71 (1st Cir. 2000). Section 3663A(a)(1) requires a district court to order a defendant to make restitution to the victim, defined as any "person directly and proximately harmed as a result of the commission of the offense for which restitution may be ordered." § 3663A(a)(2). The offenses here, "for which restitution may be ordered," were concealing assets and making a false bankruptcy oath in violation of 18 U.S.C. § 152(1) and (2).

According to Cutter, Bailey is not a victim within the meaning of § 3663A because she was not directly and proximately harmed by the bankruptcy fraud offenses for which he was convicted. Cutter explains that Bailey was required to pay $20,000 to the estate because she had purchased the house for less than fair value. Her liability to the estate did not depend on Cutter's having sworn falsely on his bankruptcy petition to the $40,000 sale price nor did it stem from his concealment of assets from the bankruptcy estate. According to Cutter, even if he had correctly listed the sale price as $72,000, the sale to Bailey would still have been for less than fair value and Bailey would and could have been successfully sued in an adversary proceeding for a fraudulent conveyance and forced to make up the difference. Conversely, had the concealed $72,000 sale price represented the property's fair

-12-

market value, Bailey would not have been required to pay an additional sum to the estate even though Cutter had misrepresented and concealed the true sale price. In short, the criminal conduct for which Cutter was prosecuted and convicted was not the "cause" of Bailey's $20,000 "loss" from settlement of the adversary proceeding.

This court emphasized the necessity for an adequate causal link between the criminal offense and the loss in <u>United States</u> v. <u>Vaknin</u>, 112 F.3d 579 (1st Cir. 1997). While a different statute, the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663 (2000), was in issue in <u>Vaknin</u>, the causation language of the MVRA is the same as that in the VWPA, making it appropriate for us to turn to <u>Vaknin</u> for guidance here.[6] <u>See</u> <u>United States</u> v. <u>Simmonds</u>, 235 F.3d 826, 831 n.2 (3d Cir. 2000) (applying circuit

---

[6]We recognize that <u>Vaknin</u> was interpreting the pre-1990 version of the VWPA that only allowed a district court to order restitution if an individual was directly and proximately harmed by the offense of conviction. Congress amended the VWPA in 1990 to provide that a victim also included "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern" if the offense "involves as an element a scheme, conspiracy, or pattern of criminal activity." Thus, "the outer limits of a VWPA § 3663(a)(2) restitution order encompass all direct harm from the criminal conduct of the defendant which was within any scheme, conspiracy, or pattern of activity that was an element of any offense of conviction." <u>United States</u> v. <u>Hensley</u>, 91 F.3d 274, 276 (1st Cir. 1996). Because the offense at issue here does not involve as an element a conspiracy or pattern of criminal activity, we are not concerned with this aspect of the definition of victim. The issue here is whether Bailey was directly and proximately harmed by the offense of conviction. To address this question, <u>Vaknin</u> remains an appropriate guide.

-13-

precedent under VWPA to interpretation of MVRA); <u>United States</u> v. <u>Mancillas</u>, 172 F.3d 341, 342 (5th Cir. 1999) (per curiam) (same). In <u>Vaknin</u>, we pronounced two "bedrock principles" regarding restitution orders. 112 F.3d at 589. First, restitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct underlying the offense of conviction. Second, restitution is inappropriate if the conduct underlying the conviction is too far removed, either factually or temporally, from the loss. From these principles, we created the following causative standard:

> This means, in effect, that the government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally). A sentencing court should undertake an individualized inquiry: what constitutes sufficient causation can only be determined case by case, in a fact-specific probe.

<u>Id.</u> at 589-90. This standard reflects the Supreme Court's pronouncement that restitution awards are limited to "the loss caused by the specific conduct that is the basis of the offense of conviction." <u>Hughey</u> v. <u>United States</u>, 495 U.S. 411, 413 (1990) (interpreting the language "direct and proximate cause" in the VWPA); <u>see also</u> <u>Mancillas</u>, 172 F.3d at 342 (finding <u>Hughey</u> applicable to the identical language in the MVRA).

-14-

As noted, Cutter argues that the government has failed to establish that, but for the conduct underlying his conviction, Bailey would not have suffered a loss. The government counters only that the evidence proved that the trustee initiated the adversary proceeding against Bailey because of Cutter's false statement that he sold his home for $40,000. The district court did not elaborate its own reasons for describing Bailey as a victim and for awarding restitution to her. Thus, it is not clear what facts the district court may have considered sufficient to satisfy the causation standard.

Cutter's assertion that his misconduct underlying the offense of conviction was not the "but-for cause" of Bailey's loss finds support in the testimony of Attorney Smith, the bankruptcy estate trustee. When asked whether he would have initiated an adversary proceeding if the bankruptcy petition had stated that Bailey had bought the house for $72,000, Attorney Smith replied that he would have initiated an adversary proceeding because the sale price of the house was still below the appraised value of $102,000. According to Attorney Smith's testimony, the appraised value "formed the basis of our settlement for the $20,000 we ultimately recovered." During his testimony, Attorney Smith emphasized that the provisions of 11 U.S.C. § 548, allowing the bankruptcy trustee to set aside a conveyance, are triggered if the property is sold for less than fair value. The debtor need not

-15-

have made a false oath or attempted to conceal assets for the trustee to set aside the transfer.

The government presented no evidence countering Attorney Smith's testimony. It argued at the sentencing hearing that Bailey was a victim of Cutter's fraudulent conduct because "the trustee initiated an adversary proceeding in the defendant's bankruptcy in order to recover [Cutter's home]" and "it was the transfer of this property to Adele Bailey that was the focus of the defendant's fraudulent acts." But while the transfer of the property from Cutter to Bailey may have created the occasion for Cutter's false oath and concealment, the latter acts were not necessary to establish Bailey's $20,000 liability to the bankruptcy estate. To prevail in the fraudulent conveyance action, the trustee only needed to show that Cutter in fact received less than fair value for the property and that he was insolvent on the date he transferred the property to Bailey. 11 U.S.C. § 548(a)(1)(B)(i)-(ii). Thus, as Attorney Smith testified, whether Cutter subsequently understated the correct sales price of his home in his bankruptcy petition was immaterial to the trustee's initiation and settlement for $20,000 of the fraudulent conveyance action against Bailey.

Given these facts, we cannot say that the government established that Bailey's loss would not have occurred but for the conduct underlying the offense of conviction. Vaknin, 112 F.3d at

-16-

589. Attorney Smith's testimony indicates that Bailey would have been liable for the $20,000 regardless of Cutter's criminal misconduct, and in any event, her liability was not dependent upon it. To be sure, Attorney Smith testified that the factors that especially attracted his attention, leading the trustee to file a fraudulent conveyance action, were the low sales price listed in Cutter's bankruptcy petition (as contrasted with an earlier $95,000 asking price) and the further fact that the house had been sold to a relative. In the sense that the $40,000 sales price aroused the trustee's suspicion, one might say that Cutter's criminal conduct bore some connection to the fraudulent conveyance action brought against Bailey. But this linkage is far too attenuated. <u>Vaknin</u>, 112 F.3d at 589-90. The basis for the trustee's $20,000 recovery from Bailey was the difference between the property's market value - in the neighborhood of $100,000 - and the $72,000 purchase price paid by Bailey. There is no evidence that Bailey was directly or proximately harmed by Cutter's bankruptcy misrepresentation. We find, therefore, no basis for awarding restitution to Bailey for the $20,000 she paid back to the estate or the $1,000 she paid in attorney's fees. Bailey had, in fact, received property worth more than she paid for it; her "loss" consisted of no more than paying back the sum necessary to reimburse the bankruptcy estate for the fair market value of what she received.

-17-

We realize that it may well be that Bailey, who was youthful and inexperienced, was pushed into an inappropriate financial transaction by her uncle, Cutter. Had Cutter been solvent, she would, of course, have benefitted by receiving property at a bargain price. But given his insolvency, he could not sell her the property at a discount. Because she lacked sufficient funds to pay the full value of the property she ultimately had to sell it at a loss. But even assuming Bailey was in some sense led down a primrose path by Cutter, her loss was not due to the particular crimes of which Cutter was convicted - the false bankruptcy oath and concealment of assets. Section 3663A provides only for restitution for the benefit of the victims of the specific crimes of which a defendant is convicted, not for restitution on broad equitable principles for other misleading or even fraudulent conduct.

**III.     Conclusion**

Cutter's conviction and sentence is **affirmed**. The $21,000 restitution award is **reversed** and the case is **remanded** for action consistent with this opinion.